# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

FLOODBREAK, LLC,
     Plaintiff,

     v.

DIEGO TRUST, LLC, et al.,
     Defendants.

No. 3:22-cv-840 (SRU)

## RULING ON MOTIONS TO DISMISS

This case is ancillary to *FloodBreak v. Art Metal Industries, et al.*, Dkt. No. 18-cv-503, a patent infringement matter FloodBreak LLC ("FloodBreak") prosecuted against Art Metal Industries ("AMI") and its chief executive and alleged alter egos Kevin Biebel ("Biebel") and Diego Trust, LLC ("Diego").  The matter settled last August and FloodBreak brought this separate action seeking to recover the $17,811,202 stipulated-to judgment.  FloodBreak sues Biebel and several individuals and entities that were not parties to the prior action but are alleged instrumentalities, or acting in concert with, the judgment debtors:  Paraiso 2, LLC ("Paraiso"), Yvonne Hermina-Biebel ("Hermina-Biebel"), Low Country-1 Investment, LLC ("Low Country"), and Javier Velez ("Velez").  The fourth amended complaint, predicated on theories of alter ego liability, alleges six counts of fraudulent transfer.

Defendants have filed three motions to dismiss, all of which rely on evidence extrinsic to the pleadings: insufficient service of process, lack of personal jurisdiction and, under a number of theories, failure to state a claim.

For the following reasons, I **deny** each of the motions to dismiss, **docs. no. 60, 78, 80**.

I.       **Standards of Review**

   A.   Lack of Personal Jurisdiction Under Rule 12(b)(2)

   A plaintiff bears the burden of showing that the court has personal jurisdiction over each

defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).

When deciding a motion to dismiss for lack of personal jurisdiction, the court may consider

affidavits and other evidence submitted by the parties. *Ensign-Bickford Co. v. ICI Explosives

USA Inc.*, 817 F. Supp. 1018, 1026 (D. Conn. 1993).

   The plaintiff's burden to show personal jurisdiction changes depending on the procedural

posture of the case. *Am. Para Prof'l Sys., Inc. v. Labone, Inc.*, 175 F. Supp. 2d 450, 454 (citing

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990), *cert. denied*, 498

U.S. 854 (1990)).  On a Rule 12(b)(2) motion when the parties have not conducted discovery, a

plaintiff must only make a *prima facie* showing of legally sufficient allegations of personal

jurisdiction. *Ball*, 902 F.2d at 197.  If the court holds an evidentiary hearing, the plaintiff's

burden rises to a preponderance of the evidence. *Metropolitan Life Ins. Co. v. Robertson-Ceco

Corp.*, 84 F.3d 560, 567.  The stage in between—when the parties have conducted jurisdictional

discovery without an evidentiary hearing—"the plaintiff's *prima facie* showing, necessary to

defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the

ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Id.*, citing *Ball*,

902 F.2d at 197.

   In diversity cases, courts apply the forum state's law to determine whether the court has

personal jurisdiction over a defendant. *Arrowsmith v. United Press International*, 320 F.2d 219,

223 (2d Cir. 1963).  "Connecticut utilizes a familiar two-step analysis to determine if a court has

personal jurisdiction.  First, the court must determine if the state's long-arm statute reaches the

foreign corporation.  Second, if the statute does reach the corporation, then the court must decide

whether that exercise of jurisdiction offends due process." *Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 81 (2d Cir. 1995) (citing *Greene v. Sha-Na-Na*, 637 F. Supp. 591, 595 (D. Conn. 1986)).

   B.   Service of Process Under Rule 12(b)(5)

   "Under Rule 12(b)(5), a party may file a motion to dismiss due to insufficiency of service of process." *Rzayeva v. United States*, 492 F. Supp. 2d 60, 74 (D. Conn. 2007) (citing Fed. R. Civ. P. 12(b)(5); *Greene v. Wright*, 389 F. Supp. 2d 416, 426 n.2 (D. Conn. 2005)). "A motion to dismiss pursuant to Rule 12(b)(5) must be granted if the plaintiff fails to serve a copy of the summons and complaint on the defendants pursuant to Rule 4 of the Federal Rules, which sets forth the federal requirements for service." *Id.* (citing *Cole v. Aetna Life & Cas.*, 70 F. Supp. 2d 106, 110 (D. Conn. 1999)). "Once validity of service has been challenged, it becomes the plaintiff's burden to prove that service of process was adequate." *Id.* (internal quotation marks omitted).

   C.   Failure to State a Claim Under Rule 12(b)(6)

   A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

   When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007);

*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the

speculative level," and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see*

*also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint,

they must be supported by factual allegations."). The plausibility standard set forth in *Twombly*

and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through

more than "labels and conclusions, and a formulaic recitation of the elements of a cause of

action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage

is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very

remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.   Background[1]

### A.   Factual Background

#### 1.   *The Underlying Action*

FloodBreak, a limited liability company organized and existing under the laws of Texas,

with its principal place of business in Texas, is in the business of flood mitigation. Fourth Am.

Compl. ("FAC"), Doc. No. 77 ¶ 2; *see id.* ¶ 19.

On March 26, 2018, FloodBreak sued Art Metal Industries, Inc. and Kevin Biebel, its

chief executive officer, alleging they willfully infringed United States Patent No. 9,752,324 ("the

---

[1] Taken from the Fourth Amended Complaint, assumed to be true, and supplemented with prior findings of this Court. *FloodBreak, LLC v. Art Metals Industries, LLC, Kevin F. Biebel and Diego Trust, LLC*, Dkt. No. 3:18-cv-503-SRU (the "Patent Action").

'342 patent"), directed to a flood prevention apparatus that can be installed in a ventilation shaft.

*See generally* Compl., Patent Action, Doc. No. 1; PJR Ruling, Patent Action Doc. No. 284 at 3.

After issuing a *Markman* ruling rejecting Defendants' proposed claim constructions and

substantially denying Defendants' four motions for summary judgment, I held a prejudgment

remedy hearing.  Patent Action, Docs. No. 46, 234-37, 276-77. I made the following findings of

fact, relevant here:

> FloodBreak owns the '342 patent, which issued on September 5, 2017.
> *See* Ex. 1.  The '342 patent is directed to a flood prevention apparatus that
> can be installed in a ventilation shaft, such as under a subway grating
> leading to an underground tunnel system like the New York City subway.
> *See id*. at Abstract. . . .

> The New York City Metropolitan Transit Authority ("MTA") awarded
> eight contracts to seven contractors ("MTA Prime Contractors") for flood
> prevention work, each of whom bid for the opportunity to provide and
> install mechanical closure devices ("MCDs") for use in ventilation shafts
> in the New York City subway system.  *See* Tr. at 49:20–50:07.  Six of
> those awards went to contractors who used MCDs supplied by FloodBreak
> and covered by the '342 patent[.] . . .

> In early 2015, FloodBreak signed its first contract to supply MCD units to
> Earth Construction Corporation.  *See* Ex. 745.549 (indicating a January
> 2015 effective date).  Around that time, Christopher Taylor, an engineer
> with Arup Group Limited, had recommended Biebel, AMI's CEO, as
> someone who might be able to assist with fabrication work or with local
> contacts to help with field inspections, shop drawings, or installation
> work.  *See* Ex. 22; Tr. at 41:4–11.  Louis Waters, FloodBreak's President,
> then reached out to Biebel to see if Biebel could provide assistance.  *See*
> Ex. 23.

> About a year later, in March 2016, Waters learned that Biebel had been
> bidding against FloodBreak on an MTA contract with "a copy" of
> FloodBreak's MCDs.  *See* Tr. at 42:3–11; 45:16–19.  ***Waters thereafter
> explained to Biebel that FloodBreak had a patent pending on it.***  *See* R.
> at 42:13–19.  After he informed Biebel of FloodBreak's patent application,
> Biebel assured Waters that he would withdraw his bid.  *Id*. at 43:21–24.
> Biebel did not follow through on that promise.

> On April 6, 2016, Biebel e-mailed RCC, informing them that he decided
> to manufacture a prototype MCD "to have for feel and touch in plant as
> well as wet test and certify to enable [RCC] to present same to MTA for

approval."[2]  Ex. 254.  Biebel then asked Tucker Murphy from Beach Erectors[3] to send him FloodBreak's drawings that were submitted with FloodBreak's bid.  *Id.*  Biebel instructed Murphy to "tell them you're planning how to install and need real numbers to understand means and methods - use the 37612 job as a reference - weights handling etc."  *Id.*

The MTA required contractors using MCDs supplied by companies other than FloodBreak to seek approval to use those MCDs as an alternative to the approved MCD model manufactured by FloodBreak.  *See* Ex. 501; Tr. at 49:20–50:1.  Accordingly, around July 8, 2016, Beach Erectors submitted to the MTA the first of many "Or-Equal" submissions for Biebel's "equal" of FloodBreak's MCD.  *See* Ex. 258.1.  As part of the "Or-Equal" submission, Biebel submitted a letter dated June 15, 2016, which stated that "[n]othing in our design infringes on patents pending or received for this device or any IP rights owned by another manufacture[r]."  *See* Ex. 258.19.  The letter was "[s]worn and signed by" Biebel.  *Id.*

On August 8, 2016, Kenneth Feng of New York City Transit e-mailed Michael Bruno of RCC about a Freedom of Information Law ("FOIL") request for AMI's "Or-Equal" submission. *See* Ex. 271.  In that e-mail, which was shared with Murphy and Biebel, Feng wrote that ***FloodBreak submitted the FOIL request "to determine . . . whether AMI has infringed on FloodBreak's intellectual property/patent(s)."***  *Id.*  Separately, Murphy had also relayed to Biebel the MTA's concerns that he was infringing on FloodBreak's patent rights.  *See* Tr. at 208:5–209:21.

On January 4, 2017, Biebel received Drawings B-511 through B-514 from Lauren Anchor of J-Track LLC, which he referred to as "new drawings from MTA – (floodbreak)."  Ex. 255.  Biebel subsequently sent those drawings to his draftsman, Domenic Cartelli, instructing him to "[g]o thr[ough] all of these new details and include in our drawings."  Ex. 256.

After the '342 patent was issued on September 5, 2017, Biebel submitted another patent assurance letter dated October 10, 2017 as part of Gramercy's "Or-Equal" submission package.  Ex. 261.22; Tr. at 202:21–204:07.  In that letter, Biebel affirmed that "[n]othing in our design infringes on patents pending or received for this device or any IP rights owned by another manufacture[r]."  Ex. 261.22.

On February 22, 2018, Edmond Bannon, ***counsel for FloodBreak, sent a letter to AMI accusing it of infringing FloodBreak's '342 patent.***  *See* Ex. 693.  Once Biebel received the letter, he forwarded a copy to Guy

---

[2] The next day, on April 7, 2016, FloodBreak's application for the '342 patent was published and publicly available.  *See* Ex. 1.1 (Prior Publication Data).
[3] Beach Erectors, Inc. is a subcontractor of RCC.  *See* Tr. at 172:15–22.

> Yale, a partner at the law firm Alix, Yale & Ristas ("AYR"), who had previously assisted Biebel with prosecuting a patent application for AMI's MCD. *See* Tr. at 494:2–15; 509:5–511:11. Yale and Tim Cieslak, an associate at the time, visited the AMI production facility to inspect AMI's MCDs on March 6, 2018. *See* Tr. at 519:12–519:22. During the inspection, Yale orally communicated to Biebel that they were of the opinion that AMI's MCD device did not infringe the '342 patent. Tr. at 524:4-13. That opinion was thereafter memorialized in an internal two-page memorandum, which was drafted by Cieslak. *See* Tr. at 527:8-145; *see also* Ex. 645. The memorandum was not shared with Biebel. Tr. at 528:2–4.

Patent Action, Doc. No. 284 (emphasis added).

After obtaining a prejudgment remedy, FloodBreak amended its complaint to add Diego as a defendant, asserting that AMI was the alter ego of both Diego and Biebel. Doc. No. 353. The case eventually came to a voluntary resolution and judgment entered on all claims for the following reasons: (1) FloodBreak owns the '342 patent, which issued on September 5, 2017, and defendants AMI, Biebel and Diego directly infringed and induced infringement of claims 1, 4-5, 8, 10, 14, and 20-24 of the '342 patent and thus were each liable for patent infringement; (2) Defendants' patent infringement was willful; and (3) the claims of the '342 Patent are valid and enforceable. Judgment, Patent Action, Doc. No. 371. Judgment entered against Defendants for $17,811,202. *Id.* at 2.

2. *This Action*

FloodBreak seeks relief on a number of grounds against Biebel, Hermina-Biebel, Velez, and entities that FloodBreak alleges are their alter egos. All causes of action relate to alleged misuse of corporate forms to avoid FloodBreak's claims in the Patent Action and remove assets from its reach.

a.   The Defendants

i.   <u>Biebel, AMI, and Diego</u>

Biebel, a Connecticut resident, is the Chief Executive Officer of AMI.  FAC, Doc. No. 77 ¶ 4.  Biebel also wholly owns and is the sole member of Diego.  *Id.* ¶ 15.  Diego is a limited liability company organized and existing under the laws of Connecticut, with a principal place of business at 564 Danbury Road, New Milford, Connecticut.  *Id.* ¶ 3.  Diego wholly owns AMI. *Id.* ¶ 15.  Biebel and Diego wholly control and dominate AMI, *id.*, and AMI and Diego co-mingle funds.  *Id.* ¶ 27.

Biebel received notice on February 23, 2018 that FloodBreak was asserting a patent infringement claim against AMI.  *Id.* ¶ 27.  Since then, Biebel caused AMI to transfer at least $4,601,968.94 to Diego.  *Id.*

Due to the judgment in the Patent Action, FloodBreak is a judgment creditor of AMI, Biebel, and Diego.

ii.   <u>Paraiso 2, LLC</u>

Paraiso is a South Carolina limited liability company.  *Id.* ¶ 6.  FloodBreak alleges that it has a principal place of business at 564 Danbury Road, New Milford, Connecticut, *id.*, but Paraiso contests that allegation and provides uncontroverted evidence, of which I take judicial

notice,[4] that Paraiso's initial designated office was located at 2 Office Park Court #103, Columbia, South Carolina.[5]

Biebel organized Paraiso on January 30, 2018 and signed Paraiso's articles of incorporation.  *Id.*

Biebel transferred his interest in Paraiso on March 1, 2018 to his wife, Yvonne Hermina-Biebel, for no consideration.  *Id.* ¶¶ 7b-7c; Am. Articles of Org., Doc. No. 85-2 at 7.  Neither Biebel nor Hermina-Biebel recorded Paraiso's membership transfer with the South Carolina's Secretary of State's Office.  Business Lookup: Paraiso.  Hermina-Biebel is now Paraiso's sole member and manager.  Hermina-Biebel Aff., Doc. No. 63, at 4 ¶ 2.

Biebel caused Diego to transfer $672,921.90 to Paraiso by wiring the funds to an escrow account at a law firm in South Carolina.  FAC, Doc. No. 77 ¶ 28.  The transfers occurred on February 28, 2018; March 5, 2018; and March 6, 2018 (the "Diego Cash Transfers").  *Id.* Paraiso used the Diego Cash Transfers to purchase residential properties in Belair, Bluffton Township, Beaufort County, South Carolina (the "South Carolina Properties").  *See id.* ¶ 7a, 29.

### iii.  Yvonne Hermina-Biebel and Low Country

Hermina-Biebel, Biebel's spouse, splits her time between New Milford, Connecticut, and Bluffton, South Carolina.  *See* Hermina-Biebel Aff., Doc. No. 31 at 3 ¶¶ 3, 7.

---

[4] A district court may consider certain materials without converting a motion to dismiss into one for summary judgment.  Those materials include matters of which judicial notice may be taken, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in the complaint by reference, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted); or any document that is not attached or incorporated by reference "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint," *id.* at 153 (citation and internal quotation marks omitted).  I take judicial notice of Secretary of State records.  *Varricchio v. Chalecki*, 3:14-CV-00937 (MPS), 2016 WL 5422046, at *4 (D. Conn. Sept. 28, 2016).
[5] *See Business Entities Online: Paraiso 2 LLC*, S.C. Sec'y of State, https://businessfilings.sc.gov/BusinessFiling/Entity/Profile/7a29358b-ad6a-4fc2-b9a4-3cb54134443a ("Business Lookup: Paraiso").

Hermina-Biebel is the sole managing member of Low Country, a Nevada limited liability company.  FAC, Doc. No. 77 ¶ 8a.  Low Country's only purpose is to act as a holding entity for Hermina-Biebel's South Carolina home.  *Id.* ¶ 8e.  FloodBreak alleges Hermina-Biebel has complete domination and control over Low Country.

Based on her complete domination and control over Paraiso and Low Country, FloodBreak alleges Hermina-Biebel caused Paraiso to wrongfully and fraudulently transfer title to the South Carolina Properties to Low Country for practically no consideration on April 18, 2022.  *Id.* ¶ 31.

### iv.  Javier Velez and nonparty Real Steel, LLC

Velez, stepson of Biebel and son of Hermina-Biebel, lives in Brookfield, Connecticut. *Id.* ¶ 9.

Real Steel, LLC ("Real Steel") was formed in 2007 with Hermina-Biebel as its sole member.[6]  FloodBreak alleges that Real Steel was formed by Biebel to hold assets for him under the protective umbrella of a limited liability company, and that Real Steel owns substantial assets consisting of valuable classic automobiles and an extensive inventory of automobile parts located at Biebel's New Milford residence.  *Id.* ¶¶ 16-17.

On January 1, 2019, Diego transferred its sole membership interest in Real Steel to Velez—the "Initial Membership Transfer."  Doc. No. 60 at 24.  Diego allegedly became "insolvent" around that time "when taking into account the expected value of Plaintiff's claim." FAC, Doc. No. 77 ¶ 62.  In March 2020, Velez remained the sole member of Real Steel; however, a non-existent entity called "Kevin Industries" signed Real Steel's 2019 annual report

---

[6] *Business Lookup: Real Steel, LLC*, Conn. Sec'y of State,
https://service.ct.gov/business/s/onlinebusinesssearch?language=en_US) ("Business Lookup: Real Steel").

as its "Manager."  *Id.* ¶ 18.  On November 22, 2020, Velez assigned ninety percent of his Real

Steel membership interest to his mother, Hermina-Biebel, for no consideration—the "Subsequent

Membership Transfer."  Doc. No. 60 at 26.

Of note, Hermina-Biebel signed Real Steel's annual filings dated 2007-2010.  Business

Lookup: Real Steel.  Biebel signed its annual filings dated 2011-2014.  *Id.*  Biebel, as a member

of Diego Trust, LLC, signed its filings dated 2016-2019.  *Id.*

### 3.  *Allegations regarding Velez*

FloodBreak brings three counts of fraudulent transfer against Velez under the

Connecticut Uniform Fraudulent Transfer Act, §§ 52-552 et seq. ("CUFTA").  Count Four of

FloodBreak's fourth amended complaint challenges Diego's Initial Membership Transfer in Real

Steel to Velez (directed by Biebel) and Velez's Subsequent Membership Transfer in Real Steel

to Hermina-Biebel.  FAC, Doc. No. 77 at ¶¶ 56-58.  FloodBreak believes at the time of the Initial

Membership Transfer, Diego's membership interest in Real Steel was its only asset other than

money it held for AMI.  *Id.* ¶ 63.  Count Five alleges that the Initial Membership Transfer made

Diego insolvent when taking into account FloodBreak's expected judgment.  *Id.* ¶ 69.  Count Six

alleges Diego intended or reasonably should have believed it would incur debts beyond its ability

to pay when it made the Initial Membership Transfer.  *Id.* ¶ 71.

### B.  Procedural History

On July 5, 2022, FloodBreak sued defendants Diego, Paraiso, Biebel, and Hermina-

Biebel.  Doc. No. 1.  The original complaint alleged intentional fraudulent transfer against Diego

and Paraiso, pursuant to Conn. Gen. Stat. § 52-552e(a)(1); constructive fraudulent transfer

against Diego and Paraiso, pursuant to Conn. Gen. Stat. § 52-552f(a); intentional fraudulent

transfer against Biebel and Hermina-Biebel, pursuant to Conn. Gen. Stat. § 52-552e(a)(1); and

constructive fraudulent transfer against Biebel and Hermina-Biebel, pursuant to Conn. Gen. Stat. § 52-552f(a).  *See generally* Doc. No. 1.

On September 2, 2022, FloodBreak filed the Second Amended Complaint ("SAC"). SAC, Doc. No. 22.  The SAC added Low Country-1 Investment, LLC as a party defendant and added allegations related to Low Country; and it asserted a new claim for collapsing transactions as part of a fraudulent transfer scheme pursuant Conn. Gen. Stat. § 52-552h(a)(C).  *See generally id.*

On October 12, 2022, defendants Diego, Biebel, Paraiso, Hermina-Biebel and Low Country moved to dismiss the SAC.  Docs. No. 31, 33, 35.  On November 2, 2022, FloodBreak opposed the motions.  Docs. No. 38-39.  Paraiso later moved for summary judgment and filed an amended motion to dismiss after obtaining leave to do so.  Docs. No. 55, 61-63.

On December 30, 2022, FloodBreak sought leave to file a third amended complaint, to which Paraiso objected.  Docs. No. 44, 45, 47.  I granted FloodBreak's motion to amend at a telephonic pretrial conference on January 11, 2023.  Doc. No. 50.

The next day, FloodBreak filed the Third Amended Complaint ("TAC"), adding Javier Velez as a party defendant, new allegations concerning Velez and Real Steel, LLC, and three new claims.  *See generally* TAC, Doc. No. 49.

On February 15, 2023, Velez moved to dismiss the TAC.  Doc. No. 60.  After the motions were fully briefed, I heard oral argument on April 4, 2023.  Doc. No. 73.  For the reasons set forth on the record at the hearing, I granted in part and denied in part the motions to dismiss of Biebel, Diego, and Paraiso (docs. no. 35 and 33); granted in part and denied in part Hermina-Biebel and Low Country's motion to dismiss (doc. no. 31); denied Pariso's motion for summary judgment and amended motion to dismiss (docs. no. 55 and 63); took Velez's motion

to dismiss (doc. no. 60) under advisement;[7] and granted FloodBreak leave to file a fourth amended complaint.

FloodBreak filed a Fourth Amended Complaint ("FAC" or "the operative complaint") on May 12, 2023.  Doc. No. 77.  The FAC added more specificity to FloodBreak's alter ego allegations.  *See generally id.*  Paraiso, Low-Country, and Hermina-Biebel filed Rule 12(b)(2) and 12(b)(5) motions to dismiss the FAC for lack of personal jurisdiction and insufficient service of process.[8]  Docs. No. 78, 80.  FloodBreak additionally moved for preliminary injunctive relief, doc. no. 76, to which I will write separately.  I held oral argument on that motion and the defendants' pending motions to dismiss on September 22, 2023, and took all motions under advisement.  Min. Entry, Doc. No. 97.

### III.   Velez's Rule 12(b)(6) Motion to Dismiss

FloodBreak brings Counts Four, Five, and Six of the FAC against Velez, all of which allege fraudulent transfer under the Connecticut Uniform Fraudulent Transfer Act, §§ 52-552 et seq. ("CUFTA").

### A.   Connecticut Uniform Fraudulent Transfers Act

CUFTA provides that "a creditor . . . may obtain . . . [a]voidance of [a] transfer or obligation to the extent necessary to satisfy the creditor's claim[,]" Conn. Gen. Stat. § 52-552h(a), when the transfer was "fraudulent" as defined by the statute.  *See* § 52-552e(a) ("A

---

[7] During the September 22, 2023 hearing, I asked counsel for Velez whether he wanted me to treat his Motion to Dismiss as directed towards the Fourth Amended Complaint in lieu of re-filing a new motion.  Tr., Doc. No. 98 4:4-6.  He indicated that he preferred me to treat the motion as directed towards the Fourth Amended Complaint.  *Id.* 4:7-9.  Accordingly, I do so here.

[8] Paraiso states in its motion, doc. no. 78, that it moves to dismiss under Rule 12(b)(6) and sets forth the *Twombly* and *Iqbal* plausibility standard.  *Id.* at 1, 9-10.  Paraiso's memorandum of law, though, includes only personal jurisdiction and service of process arguments.  I assume counsel for Paraiso made a scrivener's error, perhaps because it first moved to dismiss under Rule 12(b)(6).  Doc. No. 33.

transfer made . . . by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made . . . and if the debtor made the transfer . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor.").

To have CUFTA standing, a claimant "must have been a creditor at the time the alleged fraudulent transfer took place." *Chien v. Skystar Bio Pharm. Co.*, 623 F. Supp. 2d 255, 267 (D. Conn. 2009); *see* Conn. Gen. Stat. § 52–552e(a) ("A transfer made or obligation incurred by a debtor is fraudulent as to a creditor if the creditor's claim arose before the transfer was made or the obligation was incurred.").  A "creditor" is a "person who has a claim," § 52-552b(4), and a "debtor" is "a person who is liable on a claim."  § 52-552b(6).  A "'[c]laim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 52-552b(3).  "The legislature chose to adopt a very broad definition of the term claim." *Canty v. Otto*, 304 Conn. 546, 561 (2012) (cleaned up).  "[U]nresolved civil claims (and even civil causes of action that have not yet been brought) are sufficient to confer creditor status[.]" *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 46 (1st Cir. 2020).  Temporally, "a plaintiff's claim arises on the *date of the injury* in the underlying action," not upon the commencement of legal action or entry of judgment. *Canty v. Otto*, 304 Conn. at 561 (quoting *Davenport v. Quinn*, 53 Conn. App. 282, 304 (1999)) (emphasis added) (cleaned up).

FloodBreak's claim against Diego arose when Diego committed patent infringement— "the date of the injury." *Id.*  Diego stipulated it infringed upon FloodBreak's patent but did not stipulate as to when it did so.  Patent Action, Doc. No. 370 at 1.

Biebel and AMI became alleged debtors under CUFTA when they started facing potential liability from the patent infringement action, a claim that existed even if it was "unliquidated, . . .

contingent, . . . disputed, . . . legal, equitable, secured, or unsecured." § 52-552b(3).  Diego

became a debtor as well, "given the alter ego relationship between AMI and Diego and the

substantial cash transfers and commingling between the two . . . [FloodBreak] would be

asserting[] the patent infringement claims that were originally asserted against AMI and Biebel

against Diego as well" as soon as FloodBreak "discover[ed] [] that relationship."  FAC, Doc. No.

77 ¶ 61.  FloodBreak alleges Diego's liability commenced, at the latest, in August 2017 due to its

alleged alter ego status.  *See* Doc. No. 64 at 8-9.  By that time, Diego was a holding company for

AMI's funds, was controlled by Biebel, and was 100% owned by Biebel.  *Id*; Doc. No. 77 ¶ 15;

Biebel Dep. Tr., Doc. No. 64-1 at 137:11-139:19, 140:22-143:1, 143:18-20.

There were at least two fraudulent transfers.  A debtor's transfer is fraudulent under

CUFTA so long as it was made after the creditor's claim arose.  § 52-552e(a).  Diego's Initial

Membership Transfer to Velez occurred on January 1, 2019, doc. no. 60 at 24, and Velez's

Subsequent Membership Transfer to Hermina-Biebel occurred on November 22, 2020.  *Id.* at 26.

These transfers occurred two years *after* AMI and Biebel became debtors, and Diego began

holding AMI's funds.  FloodBreak thus has standing to sue under CUFTA.

## B. Count Four: Actual Fraud under Conn. Gen. Stat. § 52-552e(a)(1)

### 1. *Whether FloodBreak Has Sufficiently Pled Fraudulent Intent*

A fraudulent transfer under Section 52-552e(a)(1) must have been made "[w]ith actual

intent to hinder, delay, or defraud any creditor of the debtor."  § 52–552e(a).  Even assuming

actual intent to defraud must be pled with specificity, *see Nat'l Council,* 259 F. Supp. 2d at 179, a

pleader may rely on "badges of fraud . . . [,] circumstances so commonly associated with

fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp Int'l*

*Corp.,* 403 F.3d 43, 56 (2d Cir. 2005).  The statute provides a list of badges of fraud.

15

(1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer . . . (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets . . . (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred . . . (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[9]

Conn. Gen. Stat. § 52-552e(b).

FloodBreak asserts several badges of fraud.  Velez, Biebel's stepson, was an insider when he received the Initial Membership Transfer.  FAC, Doc. No. 77 ¶¶ 57, 60.  Velez then transferred most of his Real Steel membership to another alleged insider, his mother, Hermina-Biebel.  *Id.* ¶ 58; Doc. No. 60 at 26.  And as for a threatened lawsuit, FloodBreak's patent infringement action was pending when the Initial Membership Transfer and Subsequent Membership Transfer occurred.  FAC, Doc. No. 77 ¶ 61.

    a.   Insufficient Consideration and Insolvency

Diego transferred to Velez its entire membership interest in Real Steel—a company owning "substantial assets consisting of valuable classic automobiles and an extensive inventory of parts," *id.* ¶ 16, for one dollar on January 1, 2019.  Doc. No. 60 at 24.  Velez then transferred ninety percent of his membership interest in Real Steel to Hermina-Biebel for one dollar on November 22, 2020.  *Id.* at 26.  One dollar is patently insufficient consideration.

FloodBreak alleges that at the time of the Initial Membership Transfer, Diego only had two assets: its 100% membership interest in Real Steel and the money it was holding for AMI.

---

[9] Section 52-552e(b)(8) and (9) codified the common law lack of consideration and insolvency badges of fraud. *Carney v. Lopez*, 933 F. Supp. 2d 365, 377-78 (D. Conn. 2013) (citing *Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 395 (2008)).

FAC, Doc. No. 77 ¶ 63.  It appears Diego held a few million dollars for AMI at the time, *see id.*
¶¶ 23, 27-28, which means it was insolvent when considering a pending patent infringement
action worth over $17 million.

The money Diego held for AMI cannot be categorized as its own.  Taking FloodBreak's
allegations as true, Diego was already the alter ego of AMI at the time of the Initial Membership
Transfer and was holding funds that were the subject of the patent infringement action.  Doc. No.
64 at 16-17 ("the funds . . . were held under an express trust for AMI . . . . Alternatively, Diego
Trust held mere legal title to the funds as a constructive trustee").  It matters not that the patent
infringement action was unresolved at the time, because "unresolved civil claims (and even civil
causes of action that have not yet been brought) are sufficient to confer creditor status*." Foisie*,
967 F.3d at 46.

I therefore conclude that FloodBreak has sufficiently pled fraudulent intent.

C.  <u>Count Six: Intentional Fraudulent Transfer against Diego and Velez under Conn. Gen.
Stat. § 52-552e(a)(1)</u>

Count Six asserts a claim for intentional fraudulent transfer.  As stated above, *infra* IIIB.,
FloodBreak has adequately plead fraudulent intent, insolvency, and that its claim predated the
purportedly challenged transfer.  Velez claims *res judicata* bars FloodBreak's alter ego theory of
liability.  Velez's Mem. of Law, Doc. No. 60 at 10-12.  Velez's *res judicata* argument is
unavailing.

1.  *Discussion*

"Under the doctrine of *res judicata*, or claim preclusion, a final judgment on the merits of
an action precludes the parties or their privies from relitigating issues that were or could have
been raised in that action."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499 (2d Cir.

2014) (quotation marks omitted).  "To prove the affirmative defense of *res judicata* a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action."  *Id*. (cleaned up).  "The preclusive effect of a federal-court judgment is determined by federal common law."  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).

Velez argues FloodBreak cannot "revisit" allegations of alter ego liability in this proceeding because FloodBreak asserted an alter ego claim in the Patent Action and failed to recover a judgment against Diego based on alter ego liability.  Mem. of Law, Doc. No. 60, at 10-12.

The Patent Action resolved with a stipulated judgment, that is, a "settlement judgment" in light of the fact that the Court chose its own wording based on the parties' stipulation.  *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986) ("With a 'settlement judgment' the parties have agreed on the components of a judgment, including the basic aspects of relief, but have not agreed on all the details or the wording of the judgment.").  "As with a consent judgment, the judge makes no determination of the merits of the controversy" in a settlement judgment.  *Id.*  *Res judicata* is no bar, because I did not adjudicate the issue of Diego's alter ego liability on the merits in the Patent Action.

D.  Counts Five and Six: Constructive Fraudulent Transfer against Diego and Velez under Conn. Gen. Stat. §§ 52-552e(a)(2), 52-552f(a)

Counts Five and Six assert claims for constructive fraudulent transfer in connection with Diego's transfer of its membership interest in Real Steel to Velez, and Velez's subsequent transfer of his membership interest to Hermina-Biebel, for a lack of reasonably equivalent value and in the face of Diego's insolvency.

1. *Discussion*

Conn. Gen. Stat. § 52-552f provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Conn. Gen. Stat. § 52-552f.

Conn. Gen. Stat. § 52-552e(a)(2) provides "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor" if:

the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Conn. Gen. Stat. § 52-552e(a)(2).

Claims for constructive fraud under CUFTA differ from its actual fraud provision in several respects. *First*, Federal Rule of Civil Procedure 9(b) is inapplicable to its claims of constructive fraudulent transfer. *Carney v. Lopez*, 933 F. Supp. 2d at 376 (citing *Cendant Corp. v. Shelton*, 474 F. Supp. 2d 377, 380 (D. Conn. 2007)) ("Rule 9(b) is inapplicable to claims based on a theory of constructive fraudulent transfer").

*Second*, constructive fraud claimants must show that the transfer was made without the creditor receiving a "reasonably equivalent value" in exchange for the transfer instead of "actual intent to . . . defraud." *Carney*, 933 F. Supp. 2d at 382. The proof required to establish that a conveyance was made without substantial consideration is virtually identical to the proof required under these sections to establish that the entity did not receive "reasonably equivalent

value."  *Id.*  The analysis above concerning insufficient consideration and insolvency, *infra* section B.2a, is thus adopted here.

As for CUFTA Section 52-552e(a)(2)(B), FloodBreak and Velez disagree regarding whether Diego "reasonably should have believed that [it] would incur[] debts beyond [its] ability to pay as they became due."  Since the initial membership transfer occurred "2 years prior to Plaintiff's motion to add Diego as a party to the Patent case," Velez claims it "had no reason to think that it would be or could be exposed to a patent lawsuit."  Doc. No. 60 at 9.

As previously stated, FloodBreak plausibly alleges Diego's alter ego status began years prior to the Initial Membership Transfer.  A constructive fraudulent transfer does not require a defendant to have subjective knowledge that a claim may be brought against it. *See, e.g., SEC v. Antar*, 120 F. Supp. 2d 431, 445 (D.N.J. 2000), *aff'd*, 44 F. App'x 548 (3d Cir. 2002) (the debtor's "knowledge of the SEC's claim [was] wholly irrelevant" under New Jersey's constructive fraudulent transfer statute even though the defendant allegedly "had no knowledge that the SEC might seek recovery against him.").

FloodBreak thus adequately alleges its constructive fraudulent transfer claims against Velez.  I **deny** Velez's motion to dismiss, doc. no. 30.

## IV.    Hermina-Biebel, Low Country, and Paraiso's Rule 12(b)(5) Motions to Dismiss

Hermina-Biebel, Low Country, and Paraiso challenge service of process under Federal Rule of Civil Procedure 12(b)(5).  Paraiso argues service of process was improper because FloodBreak served Paraiso in South Carolina, not Connecticut, "despite alleging" that Paraiso's New Milford, Connecticut address "is its principal place of business.  If in fact that is [Paraiso's] principal place of business then service on it at a South Carolina address is improper."  Doc. No. 78 at 14 (quotation mark omitted).  Hermina-Biebel and Low Country argue "Connecticut's

long-arm statute does not permit effective service of process outside of Connecticut on Hermina-Biebel or Low Country." Doc. No. 81 at 13.

The defendants' arguments are not persuasive. Hermina-Biebel, Low Country, and Paraiso were served with methods comporting with the Federal Rules of Civil Procedure. A corporation within the United States may be served "(A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant[.]" Fed. R. Civ. P. 4(h)(1)(A)—(B). An individual within the United States may be served:

> by[] (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or (2) doing any of the following:
> (A) delivering a copy of the summons and of the complaint to the individual personally;
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(1)—(2).

FloodBreak validly served Paraiso by serving its agent, Lisa Culler, "authorized by appointment or by law to receive service of process for Paraiso." Doc. No. 16 at 2. Paraiso does not dispute Lisa Culler is authorized to receive service of process on its behalf. A corporation's principal place of business is irrelevant to service of process. Paraiso confuses service of process requirements with citizenship for the purposes of diversity jurisdiction and general personal jurisdiction. 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen . . . of the State or foreign state where it has its principal place of business."); *Daimler AG v. Bauman*, 571

U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.") (cleaned up).

FloodBreak served Hermina-Biebel and Low Country via personal service in South Carolina and by service on their attorney.  Doc. No. 81 at 2 (citing Aff. of Serv., Doc. No. 17 at 2).  Both methods satisfy Federal Rule of Civil Procedure 4.  It does not matter that FloodBreak served Hermina-Biebel and Low Country personally and through their agent instead of choosing a summons method proscribed by Connecticut law; the Federal Rules give FloodBreak the choice.

I therefore deny Hermina-Biebel, Low Country, and Paraiso's Rule 12(b)(5) motions to dismiss for insufficient service of process.

## V.      Hermina-Biebel, Low Country, and Paraiso's Rule 12(b)(2) Motions to Dismiss

### A.   Hermina-Biebel's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Hermina-Biebel argues her domicile has changed from Connecticut to South Carolina. Doc. No. 81 at 7.  I conclude FloodBreak has made a factually supported *prima facie* showing that Hermina-Biebel is domiciled in Connecticut and is subject to the state's general personal jurisdiction.

#### 1.  *General Personal Jurisdiction*

"Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant[] [] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located[.]"  Fed. R. Civ. P. 4(k)(1)(A).  "The paradigm forum for general jurisdiction over an individual is the individual's domicile, [her] home."  *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014).

Domicile is where a party resides with the purpose of making her "true, fixed and permanent home," where "[she] has the intention of returning." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983).  Individuals have only one domicile at a time. *Borderud v. Riverside Motorcars, LLC*, No. 3:18-cv-1291 (VAB), 2020 WL 2494760, at *4 (D. Conn. May 13, 2020). Residency differs.  "A residency[] [] may be taken up for personal or business reasons and may be either permanent *or* solely for a period of time. The test for an individual's residency is thus significantly less stringent than the more rigorous domicile test." *Sekiguchi v. Long*, No. 3:13– cv–01223 (CSH), 2013 WL 5357147, at *2 (D. Conn. Sept. 25, 2013) (quoting *Martinez v. Bynum,* 461 U.S. 321, 331 (1983)) (cleaned up).

Hermina-Biebel spends time at both her Bluffton, South Carolina house and her New Milford, Connecticut house.  *See* Hermina-Biebel Aff., Doc. No. 31 at 3 ¶¶ 3, 7.  Where a party has more than one residence, courts look to the totality of the evidence and "examine the entire course of a person's conduct in order to draw the necessary inferences as to the [party's] relevant intent." *Hicks v. Brophy*, 839 F. Supp. 948, 950-51 (D. Conn. 1993), *adh'd to on recons*, 841 F. Supp. 466 (D. Conn. 1994) (quoting *Brignoli,* 696 F. Supp. 37, 41 (S.D.N.Y. 1988)).  Relevant factors "include the place where civil and political rights are exercised, taxes paid, real and personal property (such as automobiles) [are] located, driver's and other licenses obtained, bank accounts maintained, [] places of business or employment. . . . whether the person owns or rents his place of residence, how permanent the residence appears, and the location of a person's physician, lawyer, accountant, dentist, stockbroker, etc." *Borderud*, 2020 WL 2494760, at *5 (quoting *Hicks*, 839 F. Supp. at 951).  Additional factors include where a defendant's family resides and where she keeps her personal belongings. *Umeugo v. Green at Bloomfield*, No.

3:19cv01392 (AVC), 2020 WL 13555056, at *3 (D. Conn. May 11, 2020).  "No single factor, however, is determinative."  *Borderud*, 2020 WL 2494760, at *5.

Much of what remains disputed is not purely factual, but rather whether the domiciliary factors tip the scales in favor of FloodBreak or Hermina-Biebel.  Accounting for the jurisdictional facts—the vast majority of which are undisputed—FloodBreak has sufficiently alleged Hermina-Biebel's domicile has not changed from Connecticut to South Carolina.

Hermina-Biebel receives medical care in Connecticut.  Doc. No. 39 at 12.  Her spouse of twenty-six years, Biebel, resides full-time in her New Milford, Connecticut house.  Biebel Dep. Tr., Doc. No. 39-1 at 6-7.  Her son resides in Connecticut.  FAC, Doc. No. 77 ¶ 9.  She pays for all of the New Milford house's bills, owns everything in the house except for Biebel's clothes, owns all six cars on the property, and keeps her legal papers in a safe located on the property.  Biebel Dep. Tr., Doc. No. 39-1 at 7-12.

Hermina-Biebel "regularly" travels to Connecticut.  Doc. No. 39 at 20 (citing Biebel Dep. Tr., Doc. No. 39-1 at 13).  She claims her travels to Connecticut amount to a maximum of five weeks, usually around the time of holidays and family birthdays.  Doc. No. 31 at 3 ¶¶ 7, 9.  Hermina-Biebel is a party to six lawsuits in Connecticut.  Doc. No. 39 at 8-9.  Hermina-Biebel and her son Velez own Real Steel.  *Id.* at 8.  Real Steel's principal place of business shared an address with Hermina-Biebel's Connecticut home until just two months after this lawsuit commenced, when she changed Real Steel's address to her South Carolina home.  *Id.*

Other domiciliary factors do not tip the scales.  Hermina-Biebel owns *both* the Connecticut home and the South Carolina home in full, albeit she owns the latter home indirectly through her alleged alter ego Low Country.  Doc. No. 96 at 20; Hermina-Biebel Aff., Doc. No. 31 at 3 ¶ 3.  She is registered to vote in *both* South Carolina and Connecticut.  Doc. No. 42 at 12;

Doc. No. 39-1 at 88.  She has a South Carolina license and car registration.  Hermina-Biebel

Aff., Doc. No. 31 at 4 ¶¶ 10, 12; Doc. No. 42 at 13.  Changing one's license, car registration, and

voter registration, however, could have been done under the guise of changing one's domicile.

In a fraudulent transfer case, those administrative changes are not persuasive.

     As for Hermina-Biebel's mental impressions, she claims her "current intention is to live

in South Carolina for the remainder of [her] life," she has no intention to live in Connecticut, and

that when she visits Connecticut, "it is [her] intention to return to [her] home in South Carolina."

Hermina-Biebel Aff., Doc. No. 31 at 3 ¶¶ 5-6, 9.  Although Hermina-Biebel's "own statements

concerning [her] intentions are relevant, [] they are of slight weight when they come into conflict

with other facts that tend to disclose a contrary intent." *Hicks v. Brophy*, 839 F. Supp. at 951

(quoting *Bevilaqua v. Bernstein,* 642 F. Supp. 1072, 1074 (S.D.N.Y. 1986)); *accord Texas v.*

*Florida*, 306 U.S. 398, 425 (1939) ("While one's statements may supply evidence of the

intention requisite to establish domicile at a given place of residence, . . . they are of slight

weight when they conflict with the fact[s].").

     FloodBreak has factually supported a *prima facie* showing sufficient to establish general

personal jurisdiction over Hermina-Biebel if credited by the trier of fact.  *Ball*, 902 F.2d at 197.  I

now turn to her alleged alter egos.

### B.  Low Country's Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

     Low Country and Paraiso are Hermina-Biebel's alleged alter egos.  FAC, Doc. No. 77

¶¶ 7-8.  Connecticut's veil-piercing law gives this Court personal jurisdiction over both entities.

#### 1.  *Piercing the Corporate Veil*

     Diego was incorporated in Connecticut, so Connecticut law governs the veil piercing

inquiry.  *Chapco, Inc. v. Woodway USA, Inc.*, 282 F. Supp. 3d 472, 481 (D. Conn. 2017).  "[T]he

traditional alter-ego standard applies in order to determine whether the corporate veil should be pierced for jurisdictional purposes." *Gamlestaden PLC v. Lindholm*, No. CV 920127912S, 1996 WL 106242, at *8 (Conn. Super. Ct. Feb. 28, 1996) (footnote omitted). "[A]lter egos are treated as one entity for jurisdictional purposes." *Avant Cap. Partners, LLC v. Strathmore Dev. Co. Michigan, LLC*, No. 3:12–CV–1194 (VLB), 2013 WL 5435083, at *12 (D. Conn. Sept. 30, 2013) (citing *Transfield ER Capt Ltd. v. Indus. Carriers, Inc.,* 571 F.3d 221, 224 (2d Cir. 2009)) (dismissing the defendants' motion to dismiss for lack of personal jurisdiction after finding the plaintiff satisfied alter-ego theory for jurisdictional purposes) (cleaned up). "Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 233 (2010) (internal citations omitted).

Connecticut uses both the instrumentality test and identity test to pierce the corporate veil and attain personal jurisdiction. *Id.* at 231-32. Success under either test is sufficient. *See NovaFund Advisors, LLC v. Capitala Grp.*, *LLC*, No. 3:18-cv-1023 (MPS), 2021 WL 3568892, at *9 n.3 (D. Conn. Aug. 11, 2021) (applying only the instrumentality test to assert personal jurisdiction over a defendant).

> The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Naples*, 295 Conn. at 232.

Factors to consider in assessing the first prong of the instrumentality test, control, include: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*NovaFund Advisors*, 2021 WL 3568892, at *9 (quoting *McKay v. Longman*, 332 Conn. 394, 441-42 (2019)).

    a.  Low Country

Addressing the first instrumentality prong, control, Low Country is completely dominated by Hermina-Biebel.  "Low Country is a holding entity that owns [Hermina-Biebel's] residence" and does nothing more.  Hermina-Biebel Aff., Doc. No. 31 at 3-4 ¶ 14; *id.* ("Low Country does not have business operations."  Low Country is undercapitalized.  *Id.* ("Low Country does not own anything other than own [Hermina-Biebel's] residence"; FAC, Doc. No. 77 ¶ 8g "Hermina Biebel, acting for Paraiso, transferred the 24 Belmeade Drive Property to Low Country for $10").  Hermina-Biebel is Low Country's sole member and manager.[10]  Hermina-Biebel uses Low Country's South Carolina residence as if it was her own.  *See* Hermina-Biebel Aff., Doc. No. 31 at 3-4 ¶¶ 3-4 ("I reside in Bluffton, South Carolina.  My home is owned by Low Country . . . . Unless I am travelling, I sleep in Bluffton, South Carolina every night.").

Hermina-Biebel formed Low Country over three years after FloodBreak commenced the Patent Action for no apparent reason other than to shield capital from FloodBreak.  FAC, Doc.

---

[10] *Nev. Business Search*, Nev. Sec'y of State, https://esos.nv.gov/EntitySearch/OnlineEntitySearch ("Business Lookup: Low Country"); FAC, Doc. No. 77 ¶ 8a.

No. 77 ¶¶ 8g-8h; Business Lookup: Low Country.  Such actions proximately caused FloodBreak harm; it still has not recovered its full Patent Action judgment.

Personal jurisdiction exists over Low Country.[11]

    b.  Paraiso

The instrumentality test applies to Paraiso for many of the same reasons, albeit with a different origin story.  Paraiso was formed on January 30, 2018 by Biebel.  Business Lookup: Paraiso.  Biebel transferred his membership in Paraiso to Hermina-Biebel for no consideration on March 1, 2018; now, Hermina-Biebel is the sole member, manager, and owner of Paraiso.  FAC, Doc. No. 77 ¶¶ 7b-7c; Am. Articles of Org., Doc. No. 85-2 at 7.  Biebel caused Diego to transfer a total of $672,921.90 to Paraiso on February 28, March 5, March 6, and August 31, 2018.  FAC, Doc. No. 77 ¶ 28.  Paraiso purchased the South Carolina properties with those funds.  *Id.* ¶ 29.  Paraiso transferred title for one of the South Carolina properties to Low Country for no consideration and sold the other for $100,000; FloodBreak alleges the proceeds "were pocketed by Hermina-Biebel."  *Id.* ¶¶ 41, 44.

Paraiso was completely dominated by Biebel and is now completely dominated by Hermina-Biebel.  Paraiso is presumably insolvent; from its inception, Paraiso's only capitalization was with funds Biebel owes FloodBreak.  FAC, Doc. No. 77 ¶ 28 (Biebel caused Diego to transfer $672,921.90 to Paraiso by wiring the funds to an escrow account at a law firm in South Carolina).  Based on the allegations and evidence before me, it seems Paraiso's only purpose and activity has been to fraudulently move funds out of FloodBreak's reach.  *Id.* ¶¶ 7a, 28-29 (Paraiso used the Diego Cash Transfers to purchase the South Carolina Properties).  As a

---

[11] I do not apply Connecticut's veil-piercing identity test, *Naples*, 295 Conn. at 232-33, seeing that the instrumentality test has been satisfied.

result of Paraiso's actions, directed by Biebel and Hermina-Biebel, FloodBreak cannot recover its full Patent Action judgment.

Personal jurisdiction exists over Paraiso.

## VI.    Conclusion

For the reasons stated above, I **deny** Velez's Motion to Dismiss, **doc. no. 60**, Paraiso's Motion to Dismiss, **doc. no. 78**, and Hermina-Biebel's Motion to Dismiss, **doc. no. 80**.

So ordered.

Dated at Bridgeport, Connecticut, this 1st day of March 2024.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge